# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 21-455


**STATE OF LOUISIANA,**
**DIVISION OF ADMINISTRATION,**
**OFFICE OF COMMUNITY DEVELOPMENT–**
**DISASTER RECOVERY UNIT**

**VERSUS**

**MARK LEGER AND DONNA LEGER**


**\*\*\*\*\*\*\*\*\*\***


APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2020-0218
HONORABLE KENDRICK J. GUIDRY, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**CHARLES G. FITZGERALD**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of D. Kent Savoie, Candyce G. Perret, and Charles G. Fitzgerald, Judges.

**AFFIRMED.**

**Mary Catherine Cali**
**John C. Walsh**
**Caroline M. Tomeny**
**William J. Wilson**
**John C. Conine, Jr.**
**Shows, Cali & Walsh, LLP**
**Post Office Box 4425**
**Baton Rouge, Louisiana  70821**
**(225) 346-1461**
**Counsel for Plaintiff/Appellant:**
     **State of Louisiana,**
     **Division of Administration,**
     **Office of Community Development–**
     **Disaster Recovery Unit**

**Jennifer A. Jones**
**Jones Law Firm**
**Post Office Box 1550**
**Cameron, Louisiana  70631**
**(337) 249-1056**
**(337) 775-8374**
**Counsel for Defendants/Appellees:**
     **Mark Leger**
     **Donna Leger**

**FITZGERALD, Judge.**

The State of Louisiana, Division of Administration, Office of Community Development–Disaster Recovery Unit (the State) filed suit against homeowners Mark and Donna Leger for breach of an Elevation Incentive Agreement. The Legers responded with an exception of prescription, which the trial court sustained. The issue before us is whether the State's lawsuit was timely filed.

## FACTS AND PROCEDURAL HISTORY

In 2004, the Legers decided to move an existing house onto some land they owned in Cameron Parish. In doing so, the Legers poured a concrete slab and then used cinderblock piers to elevate the house to just over nine feet. The Legers completed the elevation process and moved into their home in 2005. A few months later, Hurricane Rita ripped through Southwest Louisiana. The Legers' house was badly damaged, but not destroyed.

In the wake of Hurricane Rita, The Road Home Program was created. This was a federally funded program administered by the State to provide financial assistance to affected homeowners. In essence, the program offered two types of grants: compensation grants and elevation grants. The Legers, for instance, received a compensation grant of approximately $50,000 in February 2008. Then, in October 2008, they received an elevation grant of $30,000. Only the elevation grant is at issue in this appeal.

In general, the elevation grant was offered as an incentive for homeowners in flood-prone areas to elevate their homes to a level that met or exceeded the Advisory Base Flood Elevations established by the Federal Emergency Management Agency (FEMA). The terms of the elevation grant were set forth in a generic Elevation Incentive Agreement. The Legers signed this agreement on October 29, 2008.

Eleven years later, on January 17, 2020, the State filed suit against the Legers for breach of contract. The essence of the suit is that the Elevation Incentive Agreement required the Legers to elevate their home within three years of signing, and that the Legers breached the agreement by failing to comply with this provision.

In response, the Legers filed the peremptory exception of prescription. The Legers concede that they breached the Elevation Incentive Agreement. However, they argue that the breach occurred when the agreement was signed on October 29, 2008.

The hearing on prescription was held on March 22, 2021. After listening to the witness testimony and reviewing the documents in evidence, the trial court sustained the exception from the bench. A written Judgment was signed on March 25, 2021. It is from this Judgment that the State has appealed.

On appeal, the State asserts the following assignments of error:

1. The trial court erred in finding that the Petition was prescribed on its face and shifting the burden of proof to [the State].

2. The trial court erred in finding that prescription commenced when the Legers signed the Elevation Incentive Agreement on October 29, 2008.

3. The trial court erred in finding that the doctrine of *contra non valentem* did not apply to suspend prescription until October 29, 2011.

## LAW AND ANALYSIS

The prescriptive period for a breach of contract claim is ten years under La.Civ.Code art. 3499. Prescription begins to accrue when the contract is breached. *Deshotels v. Fruge*, 364 So.2d 258 (La.App. 3 Cir. 1978), *writ denied*, 367 So.2d 388 (La.1979).

2

"The burden of proof on the prescription issue lies with the party asserting it unless the plaintiff's claim is barred on its face, in which case the burden shifts to the plaintiff" to prove a suspension or interruption of prescription. *Bailey v. Khoury*, 04-620, 04-647, 04-684, p. 9 (La. 1/20/05), 891 So.2d 1268, 1275; *Smith v. Ieyoub*, 01-1517 (La.App. 3 Cir. 3/6/02), 809 So.2d 1256.

At the hearing on the exception of prescription, evidence may be introduced to support or to controvert the exception. La.Code Civ.P. art. 931. If evidence is introduced, the trial court's factual findings are reviewed under the manifest error standard. *Succession of Savoie v. Carmouche*, 18-601 (La.App. 3 Cir. 3/7/19), 269 So.3d 931, *writ denied*, 19-548 (La. 6/17/19), 274 So.3d 1257.

"However, where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent de novo review of the record and determine a preponderance of the evidence." *Evans v. Lungrin*, 97-541, 97-577, pp. 6-7 (La. 2/6/98), 708 So.2d 731, 735. Of course, pure questions of law are also reviewed de novo.

### *First Assignment of Error.*

The State initially asserts that the trial court erred in finding that the petition was prescribed on its face and then shifting the burden of proof to the State. Because this is a question of law, we review this assignment de novo.

The record shows that the trial court made the following findings before any evidence was adduced:

> All right. As a matter of law, I find that the Petition—excuse me—yes, the Petition or the contract in 2008 prescribed on its face. I find that as a matter of law, the State has the burden now in this Exception of Prescription hearing, and you may proceed.

The 2008 contract is the Elevation Incentive Agreement dated October 29, 2008. This agreement is one of many documents that were attached to the petition. However, there is nothing in the petition (including the attached documents) to suggest that the State's breach-of-contract action is prescribed.

On the contrary, the petition alleges that the Legers' home was damaged by Hurricane Rita in September 2005; that the Legers signed the Elevation Incentive Agreement on October 29, 2008; that under the agreement, the Legers had three years to elevate their home to meet or exceed the existing Advisory Base Flood Elevations established by FEMA (9.0 feet); that the three-year term for performance ended on October 29, 2011; that the Legers failed to elevate their home within this three-year period; and that this failure amounted to a breach of contract. If anything, the petition and documents attached thereto reflect that the Legers' breach occurred on October 29, 2011, which is when the agreement's three-year term ended.

In sum, the trial court erred as a matter of law in concluding that the State's petition was prescribed on its face. The trial court also erred as a matter of law in shifting the burden of proof to the State.

"Placing the burden of proof on the wrong party is legal error that will interdict the fact-finding process by placing a more onerous standard than the law requires on one of the parties." *Kinnett v. Kinnett*, 17-625, p. 20 (La.App. 5 Cir. 8/6/20), 302 So.3d 157, 174. Therefore, the trial court's factual finding—that the Legers' breach occurred on October 29, 2008—is no longer entitled to the manifest error standard of review. *See Evans*, 708 So.2d 731.

4

*Second Assignment of Error.*

The State asserts that the trial court erred in finding that prescription commenced when the Legers signed the Elevation Incentive Agreement on October 29, 2008. For the reasons given above, we review this assignment de novo.

At the outset, all parties agree that the State's claim is for breach of contract subject to a liberative prescription period of ten years under La.Civ.Code art. 3499. They also agree that prescription commenced when the Elevation Incentive Agreement was breached. So when did the Legers breach the agreement? In essence, this is the factual dispute.

In relevant part, the Elevation Incentive Agreement states as follows:

4. **ELEVATION INCENTIVE AGREEMENT CONDITIONS:**
   By accepting this grant provided through this Elevation Incentive Agreement, I agree that:

   a. **Flood Elevation Compliance:** Within three years of the date of this Elevation Incentive Agreement, the elevation (height) of the home on the above Property will be at or above the Advisory Base Flood Elevation (ABFE) published by FEMA. Where no ABFE has been published for the Property, the property must be elevated to meet the Base Flood Elevation (BFE) shown on the community's legally adopted Flood Insurance Rate Map (FIRM) floodplain regulatory map, plus any freeboard required by local ordinance. ABFE and BFE are those elevations in effect on the date this Agreement was signed. *By accepting the Elevation Incentive, I assert that when the home was damaged by Hurricane Katrina or Rita, its elevation was lower than the elevation required under this Agreement.* I understand that to comply with this paragraph, I must elevate my home to be at or above the elevation required by this Agreement even if the authority having jurisdiction of building code enforcement is not requiring elevation of the home. Adoption of a new FIRM by the community subsequent to signing of this Agreement, which new FIRM may have BFEs higher or lower than the ABFE or BFE in effect on the date of signing, will not change the elevation required by this Agreement.

5

. . . .

> **c. Obligation to Return Elevation Incentive for Failure to Comply:** If the home on the Property does not meet or exceed the applicable ABFE's or BFE's by three years from the date of this Elevation Incentive Agreement, the entire amount of my Elevation Incentive must be repaid to the State of Louisiana. [Italicized emphasis added.]

The elevation required under the Elevation Incentive Agreement was 9.0 feet. The Legers point to the above emphasized language and argue that they breached this provision on the day the agreement was signed because when their home was damaged by Hurricane Rita, its elevation was 9.3 feet, which is higher than the elevation required under the agreement.

The State disagrees, arguing that the Legers failed to prove that their home's elevation was 9.0 feet or higher when Hurricane Rita ripped through Cameron Parish. This, along with the Legers' admission that they did not elevate their home during the agreement's three-year term, means that the Legers' breach did not occur until October 29, 2011. This is the State's argument.

At the hearing on prescription, Mr. Leger testified that he and his wife moved their home to its present location in 2005. He explained that prior to doing so, they obtained a building permit from Calcasieu Parish that required them to comply with the Advisory Base Flood Elevation published by FEMA, which provided for an elevation of 8.0 feet above sea level at that time. To this end, the Legers poured a concrete slab and set the house upon cinderblocks. According to Mr. Leger, this process elevated the home to 9.3 feet, as reflected in a 2005 elevation certificate prepared by Leo Reddoch.

However, in September 2005, Hurricane Rita blew through Cameron Parish. Then, in 2007, Mr. Leger and his wife began exploring the possibility of a

compensation grant from The Louisiana Road Home Program. To this end, Mr. Leger spoke with a female Road Home representative who requested an elevation certificate as a prerequisite to receiving any funds. Mr. Leger, in turn, provided Road Home with a copy of the 2005 elevation certificate, along with all other information required for the application. Shortly thereafter, in February 2008, the Legers received a compensation grant of approximately $50,000.

However, according to Mr. Leger, during the application process for the above compensation grant, the same female Road Home representative told him about the possibility of receiving additional funds—separate and apart from the $50,000 compensation grant—in the form of an elevation incentive. As Mr. Leger explained, the representative stated that the elevation funds would not have to be used by the Legers to elevate their home. The money, for example, could be used to haul dirt onto their property to increase the land's elevation, to elevate their air-conditioner units, to elevate their utility meter, or to finish repairs.

In April 2008, merely two months after receiving the compensation grant, the Legers received a letter from the State informing them that elevation incentives were available to eligible Road Home applicants (1) who selected Option 1 in their initial application for the compensation grant, and (2) whose homes were located in areas where FEMA had issued Advisory Base Flood Elevation maps. These were the only two eligibility requirements.

Attached to this letter was a form titled "Benefit Selection Form." The form was sent to the Legers with their names and address already filled in, along with a typewritten "X" next to the line that read: "You are eligible for Elevation Compensation." Because the Legers met both eligibility requirements, they signed

7

and returned the form to the Road Home Program. All of these documents are in evidence.

As to the Elevation Incentive Agreement, Mr. Leger testified that he and his wife signed this agreement on October 29, 2008. He testified that prior to signing, he never told anyone at Road Home that his house was already above the required elevation level. As he put it, he never meant to deceive anyone or misrepresent anything when he signed the agreement. He believed that Road Home knew his house exceeded the agreement's required elevation based on his 2005 elevation certificate. And he did nothing to prevent Road Home from independently determining his home's elevation.

The State called as its only witness Jeff Haley, who is the Chief Operating Officer for the Office of Community Development–Disaster Recovery Unit. Mr. Haley admitted having no interaction with the Legers. In fact, Mr. Haley did not become an employee of the State until 2009. Mr. Haley explained that before his employment with the State, he worked for the contracting firm that was tasked with verifying the eligibility of Road Home applicants and otherwise administering the program. He was employed by this company from 2006 to 2009, which includes the period when the Legers received both of their grants.

Nevertheless, Mr. Haley testified that in April 2008, the State sent approximately 40,000 letters to homeowners who were predetermined as being eligible for an elevation grant. According to Mr. Haley, for "the 40,000 people who got [the letter], the program was saying you were eligible. There wasn't something that they had to do or show us at that point in time in 2008 to prove eligibility."

Mr. Haley then discussed the pressure of disbursing the grant money as quickly as possible, explaining:

It was 2008, the pressure was to be able to get the money out as soon as possible. We had already had the Legers, and others, come in for an appointment. We had already deemed them eligible for the program. They'd already received the [compensation] grant, so basically, the people who could get elevation just had to say they wanted it[.]

The State did not require any verification from the Legers as to whether their property was below the elevation required by the Advisory Base Flood Elevation maps. Nor did the State make any attempt to verify this information from any other source, such as parish government. The reason for this failure was, according to Mr. Haley, "We didn't have time." Instead, once the homeowner indicated they were interested, the file was sent directly to the title company for closing.

Mr. Haley also testified that Road Home maintained a file on all applicants, including the Legers. For example, on page five of the Legers' file, which is in the record, there is the following question: "Is home required to be elevated?" The corresponding answer is "N" for no. The next question asks: "Is homeowner eligible to receive elevation assistance and not required to elevate?" In response, there is a "Y" for yes. The above questions and answers were populated by FEMA and made part of the Legers' file pursuant to an information-sharing agreement between FEMA and the State.

On appeal, the State claims that they never received the Legers' 2005 elevation certification. This certificate is also not in the record on review. However, in 2014, the State requested, and Mr. Leger provided, an additional elevation certificate. The 2014 certificate is in evidence; it reflects an elevation of 9.3 feet for the Legers' home.

In the end, we find by a preponderance of the evidence that the Legers' breach occurred on October 29, 2008. The Legers' home was elevated to 9.3 feet in 2005, and the home's elevation remained unchanged at all relevant times thereafter. Thus,

9

the Legers were noncompliant from the moment the agreement was signed, meaning that prescription commenced on October 29, 2008. The State's suit was filed on January 17, 2020, more than ten years after the Legers' breach. This assignment is therefore without merit.

### *Third Assignment of Error.*

In its third assignment of error, the State contends that the trial court erred in finding that the doctrine of *contra non valentem* did not apply to suspend prescription until October 29, 2011.

Unlike the second assignment of error, our review here is under the manifest error-clearly erroneous standard. The reason is because the legal errors committed by the trial court—finding that the State's petition was prescribed on its face and shifting the burden of proof to the State—did not affect its factual findings regarding *contra non valentem*. The State, after all, had the burden of proving that prescription was suspended.

Now to the jurisprudential doctrine of *contra non valentem*. In *Mantiply v. Hoffman*, 18-292, p. 6 (La.App. 3 Cir. 1/16/19), 263 So.3d 1193, 1199, *writ denied*, 19-588 (La. 6/3/19), 272 So.3d 544, this court explained:

> The doctrine itself is based upon the theory that when a plaintiff is not aware of the facts giving rise to his or her cause of action against a particular defendant, the running of prescription is suspended until the . . . [plaintiff] discovers or should have discovered the facts upon which his or her cause of action is based.

Moreover, *contra non valentem* only applies in exceptional circumstances. *Marin v. Exxon Mobil Corp.*, 09-2368, 09-2371 (La. 10/19/10), 48 So.3d 234. To this end, the Louisiana Supreme Court has limited the application of the doctrine to these four categories:

10

(1) where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's actions; (2) where there was some condition coupled with a contract or connected with the proceedings which prevented the creditor from suing or acting; (3) where the debtor himself has done some act effectively to prevent the creditor from availing himself of his cause of action; or (4) where some cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant.

*Specialized Loan Serv., LLC v. January*, 12-2668, pp. 5-6 (La. 6/28/13), 119 So.3d 582, 585.

In the case before us, the State contends that the third and fourth categories are applicable. We will therefore discuss these categories in that order.

The third category is specifically invoked when "(1) the defendant engages in conduct which rises to the level of concealment, misrepresentation, fraud or ill practice, (2) the defendant's actions effectually prevented the plaintiff from pursuing a cause of action, and (3) the plaintiff must have been reasonable in his or her inaction." *Marin*, 48 So.3d at 252 (citations omitted).

On review, the evidence fails to support a finding of fraud, misrepresentation, concealment, or any other action on behalf of the Legers which would have prevented the State from timely pursuing its claim.

For starters, the State's eligibility letter of April 2008 is deceiving because it informs the Legers that they were eligible to receive the elevation funds when clearly they were not. The letter does not state that the Legers might be eligible; it states that the Legers were eligible. The Legers were not the only homeowners who were confused. According to Mr. Haley, approximately 32,000 homeowners received an elevation grant. Yet 6,000 of these homeowners ended up being noncompliant (in breach of the agreement) for failing to elevate their homes. This is a staggering statistic.

Next, Mr. Leger testified that he never meant to deceive anyone or misrepresent anything when he signed the Elevation Incentive Agreement. He believed that Road Home knew of his home's elevation at the time of signing. He also testified that he did nothing to prevent Road Home from independently determining his home's elevation. Mr. Leger's testimony was not contradicted at trial.

And finally, the evidence shows that the State's inaction—rather than the Legers' actions—prevented it from timely filing suit. As already explained, Road Home could have looked in its own file and seen that the Legers' home was not required to be elevated. Multiple Road Home representatives failed to do so prior to the signing of the elevation agreement. This is evident based on telephone calls between case workers and the Legers, which were documented in the Legers' file. And according to other documents in the Legers' file, a representative named Charles Langley noted: "No open issues – all issues resolved. I have researched this case and verified that all issues are clear and ready for [closing]." Mr. Langley was not called as a witness by the State.

In sum, the trial court found that the State failed to prove that prescription was suspended under the third category of *contra non valentem*. This finding is reasonably supported by the record.

Now to the fourth category of *contra non valentem*. This category operates to suspend prescription "where the cause of action is neither known nor reasonably knowable by the plaintiff even though plaintiff's ignorance is not induced by the defendant." *Marin*, 48 So.3d at 245. For this category to apply, the plaintiff's ignorance of his cause of action cannot be attributable to his own willfulness or neglect, as a plaintiff is deemed to know what he could have learned by reasonable

12

diligence. *Renfroe v. State ex rel. Dep't of Transp. and Dev.*, 01-1646 (La. 2/26/02), 809 So.2d 947.

As addressed previously, the State could have determined the Legers' ineligibility before October 29, 2008. Mr. Haley acknowledged that if the Legers' home was already above the agreement's required elevation, they would not have been eligible for the elevation grant. But even after the elevation agreement was signed on October 29, 2008, the State could have discovered the Legers' ineligibility (or noncompliance) by using reasonable diligence, such as simply reviewing the Road Home file for the Legers or contacting parish government to verify the home's elevation.

In the end, the trial court found that the fourth category of *contra non valentem* did not suspend the running of prescription. And based on our review, we cannot say that this finding is manifestly erroneous or clearly wrong.

For the above reasons, this assignment of error is without merit.

## DECREE

We affirm the Judgment of the trial court sustaining the peremptory exception of prescription filed by the defendants, Mark Leger and Donna Leger. In accordance with La.R.S. 13:5112, the costs of this appeal are assessed against the State of Louisiana, Division of Administration, Office of Community Development–Disaster Recovery Unit in the amount of $2,552.59.

**AFFIRMED.**